**STATE of Missouri, Respondent,**

v.

**Ronald Eugene BRASEL, Appellant.**

**No. 59243.**

Supreme Court of Missouri,
En Banc.

June 14, 1976.
Rehearing Denied July 12, 1976.

David C. Godfrey, Clayton, for appellant.

John C. Danforth, Atty. Gen., by Philip M. Koppe, Asst. Atty. Gen., for respondent.

FINCH, Judge.

This is an appeal from a conviction on a two-count indictment for unlawful possession of controlled substances in violation of § 195.017.[1] Defendant was sentenced to concurrent four year terms on each count,

1. All statutory references are to RSMo 1969 unless indicated otherwise.

but sentence was suspended and defendant was placed on probation for five years. Defendant appealed to the Missouri Court of Appeals, St. Louis District, which affirmed the conviction on Count I, but reversed and remanded on Count II. After application to transfer by both defendant and the State, we ordered the case transferred and now decide it as though here on direct appeal. Art. V, § 10, Mo.Const.

Disposition of this case depends on whether the arrest of defendant without a warrant was based on probable cause and whether certain searches and seizures incident to that arrest were lawful. We conclude that both of these questions are to be answered in the affirmative. Hence, we affirm the judgment.

On April 10, 1972, defendant registered at the Inn America Motel in St. Louis County as a chemist named Ronald Bradley from Kansas City. He was assigned room 233 for which he paid one week in advance. Subsequently, he paid for a second week which ran to April 25, 1972.

On Saturday, April 22 and again on Sunday, April 23, the maid assigned to clean a block of rooms which included room 233 noticed a "Do Not Disturb" sign on the door leading to that room. On each day it remained on the door into the afternoon. On Saturday, the maid did nothing, but after it remained until mid-afternoon on Sunday, April 23, she reported this fact to Mrs. Sandler, her supervisor. Mrs. Sandler then called room 233. Someone answered the telephone and indicated he did not want the room made up. She then did nothing further.

Again, on Monday the maid noticed a "Do Not Disturb" sign on the door. About mid-afternoon, she knocked on the door and when she received no response, she used her key and entered the room. She observed bottles of what appeared to be medicines on the dresser and sacks of such bottles on the floor. She stated that the bed was all torn up. She went next door and called Mrs. Sandler to report what she had seen. Mrs. Sandler then came and opened the door and both she and the maid entered room 233.

After observing the room and its contents, Mrs. Sandler reported the matter to Mr. Armstrong, the motel manager.

Mr. Armstrong first checked the registration for the room. He then called the room but received no response. He and Mrs. Sandler then went to room 233, unlocked the door and entered. Armstrong remained in the room ten or fifteen minutes during which time he examined the grocery-type paper sacks which contained large quantities of drugs as well as the containers on the dresser. He observed that these bottles contained pills and capsules and many had federal warrants on them.

After closing and locking the door, Armstrong returned to his office and called the county police. He told the officers that there was a large assortment of drugs in the room in question. Shortly thereafter, five officers from the St. Louis County drug squad came to Armstrong's office. He showed them defendant's registration card, which showed the name Ronald Bradley and gave the license number of his automobile. Armstrong stated that he wanted to show them what he had observed and he then took the officers to room 233. Armstrong unlocked the door and he, followed by the officers, entered. The officers then observed first hand the bottles of pills and capsules on the dresser and in the paper sacks which Armstrong had reported to them. Federal warrants were attached to many of the bottles and one officer estimated that there could be 300,000 pills and capsules. The officers then contacted police headquarters for a check on the license number shown on defendant's registration card and thereby learned that the car was registered to Ronald Brasel of St. Louis County, not Ronald Bradley of Kansas City.

After their examination of room 233 and its contents, the officers arranged with Armstrong to occupy the adjoining room for the purpose of a stakeout of room 233. They remained there until about 10 o'clock that night when defendant returned to the motel. He was observed parking his automobile and then coming to his room carrying an attache case and some clothes.

Shortly after the officers heard defendant enter room 233 and close the door, Officer Zinselmeier knocked on the door of room 233. When defendant opened the door, Zinselmeier displayed his police badge and asked if he might come in. Defendant, according to the officer, indicated that he could enter and opened the door wider for that purpose. Zinselmeier then entered, as did Officer Reifschneider who had been standing by Zinselmeier. The other officers also had come out of the adjoining room, but it is not clear from the transcript whether they were standing at the door when it was opened by defendant Brasel. In any event they entered defendant's room shortly after Zinselmeier and Reifschneider entered.

Immediately on entering, Zinselmeier asked defendant for some identification. He produced his driver's license and stated that he was Ronald Brasel. Officer Zinselmeier then placed him under arrest on suspicion of unlawful possession of controlled substances and frisked him. When the officer patted defendant's pants pocket, he felt a large bulge. He reached into the pocket and discovered a quantity of pills.[2] The attache case which defendant had carried as he returned to the room was on a chair about four feet from defendant. It was opened promptly and in that search other pills were found.[3]

Count I of the information on which defendant was prosecuted was based on possession of the pills found in defendant's trouser pocket. Count II was based on the pills found in the attache case. Defendant was not prosecuted for the possession of the large quantity of pills which were in room 233 and which had been observed there by the motel personnel and later by the officers.

Defendant filed a motion to suppress the evidence obtained by the search of the defendant's person and his attache case. The court overruled that motion and admitted in evidence the pills found in defendant's

trouser pocket and the pills found in his attache case. Defendant complains with reference thereto on appeal. Since these searches were incident to an arrest and not pursuant to a search warrant, we must determine first whether the arrest of defendant by Officer Zinselmeier after he entered the room was a lawful arrest, that is, whether it was made with probable cause.

Probable cause was defined in *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) in these words:

"* * * Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."

A further explanation of what is necessary for there to be probable cause was given in *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949):

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved."

A recent decision by this court involving the issue of probable cause was *State v. Wiley,* 522 S.W.2d 281 (Mo. banc 1975), wherein the court reviewed the law on probable cause and then considered the validity of a warrantless arrest, as well as the admissibility of evidence seized incident to that arrest. Responding to anonymous tips giving officers the specific location of suspects and specific information indicating that the suspects possessed controlled sub-

---

**2.** There were 162 red colored capsules later determined to be seconal barbituates.

**3.** There were 31 amphetamine capsules.

stances, the officers approached the front door of the suspects' apartment, announced that they were police officers, arrested the occupants for possession of controlled substances and searched the area which the informer had stated would house the drugs. In considering the legality of the arrest, the court stated, 522 S.W.2d at 287,

"The evidence to be admissible in this case must be the 'product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists "where *the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed."* Brinegar v. United States, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, 1890 (1949), quoting from *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543, [555], 39 A.L.R. 790 (1925).' *Ker v. California,* 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963).

"Whether there was probable cause to arrest the appellant along with others in the apartment *depends on the information in the officers' possession prior to the arrest.* Of course, *all the information in the possession of the officers and all reasonable inferences therefrom are pertinent to determine probable cause.* Whether there is justification for probable cause to arrest without warrant must be determined by *practical considerations of everyday life on which reasonable men act and is not to be determined by hindsight by legal technicians. Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The determination of probable cause depends upon the particular facts and circumstances of the individual case and no ready 'litmus paper test' can be applied. Probable cause may be based on hearsay. There is a broad gulf between what is required to prove guilt and the requirement of probable cause. We deal here with controlled substances. In such cases officers may well have to depend on informers, special employees and on their own special experience. *United States v. Kancso,* 252 F.2d 220 (2nd Cir. 1958)." (Emphasis supplied.)

■ In deciding whether the officers had probable cause in this case for arresting defendant, we conclude that they could not utilize and rely upon information obtained by their entry into and search of room 233 during the afternoon of April 24. They had no search warrant and they had no consent from defendant to enter and search. The motel personnel could not give such permission. Cases so holding include *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1963), in which the court refused to uphold a police search of a hotel room based upon the hotel clerk's consent to the entry, stating at 489, 84 S.Ct. at 893:

"It is important to bear in mind that it was the petitioner's constitutional right which was at stake here, and not the night clerk's nor the hotel's. It was a right, therefore, which only the petitioner could waive by word or deed, either directly or through an agent."

To the same effect *see United States v. Jeffers,* 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951).

■ However, the fact that the officers made an unauthorized entry and search of room 233 does not make the subsequent arrest of defendant illegal if the officers had sufficient information, received independently of the illegal search, to provide probable cause for the arrest. For the reasons subsequently discussed, we conclude that the officers did receive information from the motel personnel which, without reliance on their own search of room 233, provided probable cause for arrest of defendant.

First, this information, received by the officers from the motel people, came from a reliable informant. Armstrong occupied a position of considerable responsibility. He was the manager of a substantial business.

Some of his employees discovered and reported to him large quantities of drugs in one of the motel rooms occupied by a guest. He did what a manager would be expected to do, and notified the police of those facts. The police came to his office and talked to him and were shown the room registration filled out by the occupant of the room in question. Later that afternoon, the officers had an opportunity to verify what the motel personnel had observed when they talked to Mrs. Sandler, the head housekeeper, who also had been in the room and observed its contents.

In *State v. Perry*, 499 S.W.2d 473 (Mo. 1973), this court considered the reliability of an informant who called the police station and, although not giving his name, identified himself as a Bi-State bus driver. He told the answering officer that he had observed the occupants of a car flourishing a weapon, describing and giving the license number of the car. In holding that the informant was reliable, the court said, 499 S.W.2d at 475, 476:

"In the absence of exceptional circumstances not here present a citizen-informant who states that he has witnessed a crime may reasonably be deemed by an arresting officer to be reliable, *McCreary v. Sigler*, 406 F.2d 1264, 1269 (8th Cir. 1969), cert. den. 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773; *Smith v. Swenson*, 328 F.Supp. 747 (W.D.Mo.1971), although his reliability has not theretofore been proved or tested. *State v. Whorton*, 487 S.W.2d 865 (Mo.1972). *The informant in this case was no mere tipster suggesting to police the possibility that an offense may have been committed in the past or might be committed in the future. His report was not based upon suspicion, underworld rumors or hearsay. Nor was he giving mere conclusions with respect to the commission of offense. This informant gave a straightforward eyewitness account of what had happened, of his own personal knowledge. He gave specific information* identifying the automobile, including the license number. 'There could only be one car in existence that could fit that precise description.' *Conley v. Beto*, 328 F.Supp. 49, 53 (S.D.Tex.1971). *His information led the police directly to appellant. United States ex rel. Cardaio v. Casseles*, 446 F.2d 632, 636–637[3] (2nd Cir. 1971). While the informant's name was not made known his occupation of bus driver was given." (Emphasis supplied.)

Applying the tests utilized in *Perry*, it is evident that Armstrong was a reliable informant.[4]

▇▇▇ Second, the protection of the fourth amendment against unreasonable search and seizure does not apply to actions of private individuals not acting pursuant to a request by the police. In this case there was no contention that the police had anything to do with the entry and search of room 233 by motel personnel. Hence, the information given by Armstrong to the police did not violate defendant's fourth amendment rights, even though such entry and search were without the consent of the occupant. Therefore, the information derived therefrom and passed on to the police could be relied upon by the police to establish probable cause. In *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921), the Supreme Court enunciated this principle, stating,

"The Fourth Amendment gives protection against unlawful searches and seizures, and as shown in the previous cases, its protection applies to governmental action. Its origin and history clearly show that it was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies; as against such authority it was the purpose of the Fourth Amendment to secure the citizen in the right of unmolested occupation of his dwelling and the possession of his property, subject to the right of seizure by process duly issued."

---

4. In this connection see also discussion by court in *State v. Cox*, 294 Minn. 252, 200 N.W.2d 305, 306–7 (1972), including footnote 1 thereto and the cases cited therein.

In *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971), the court concluded that the fourth amendment exclusionary rule was only applicable to prevent police misconduct and stated,

"But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals."

Other cases which hold that the fourth amendment protections do not apply to private action are *Kaufman v. United States*, 453 F.2d 798 (8th Cir. 1971); *United States v. McGuire*, 381 F.2d 306 (2nd Cir. 1967); *United States v. Burton*, 341 F.Supp. 302 (W.D.Mo.1972); *State v. Stark*, 502 S.W.2d 261 (Mo.1973); *State v. Hepperman*, 349 Mo. 681, 162 S.W.2d 878 (1942).

■ We conclude that the information relayed by Armstrong and that which the officers acquired by checking with police headquarters was sufficient to establish probable cause to arrest. The officers had been told by Armstrong, the manager, that he had observed large quantities of drugs in one of his motel rooms, a place where one is not reasonably expected to be in possession of large quantities of drugs. What he reported caused *five* drug squad officers to come at once to Armstrong's office. They talked to Armstrong and were shown defendant's registration card. They subsequently learned by a check at their headquarters that the automobile license listed by the occupant was registered to Ronald Brasel of St. Louis County, not Ronald Bradley of Kansas City, the name defendant had used in registering. Later that afternoon, as previously noted, the officers also talked to Mrs. Sandler, the housekeeper.

Unfortunately, no one asked Armstrong or the officers to recite the full details of what he told them when he telephoned or when he talked to them shortly thereafter when they came to his office. Whether, in addition to stating that he had observed large quantities of drugs in a motel room,

he detailed the fact that there were paper sacks filled with bottles of drugs, as well as many bottles on the dresser, and whether he told them that many bore federal warrants, indicating controlled substances, was not asked. The fact that *five* officers responded to the call would indicate that substantial information as to what Armstrong had observed with reference to the drugs was given. We conclude and hold that from the above sources, without considering any information the officers obtained by their mid-afternoon search of room 233, Officer Zinselmeier had sufficient information when he arrested defendant to warrant a prudent man, based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act,"[5] to arrest defendant on suspicion of unlawful possession of controlled substances.

This being true, were the searches of defendant's person and attache case permissible searches incident to the lawful arrest of defendant by Officer Zinselmeier?

■ The right of an officer to conduct a full search of the person incident to a lawful custodial arrest was discussed at length and clearly delineated in *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973), in this language:

" * * * The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the war-

5. *Brinegar v. United States*, 338 U.S. at 175, 69 S.Ct. at 1310.

rant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment."

Accordingly, we hold that the search of defendant's person by Officer Zinselmeier immediately after he was placed under arrest was lawful and the trial court properly overruled defendant's motion to suppress the 162 seconal barbituate capsules.

In *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the court recognized that in addition to the right of an officer to search the person of one placed under arrest, the officer may also search for weapons and evidence of the crime in the area referred to as being within the arrested person's immediate control. This right was recognized in this language at p. 762, 89 S.Ct. at p. 2040:

> " * * * When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that

phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

■ The evidence indicates that the attache case was on a chair perhaps four feet from the defendant. It was not locked. It did have a catch but it could be released by merely pushing a button. Officer Zinselmeier testified that he did not know what was in the case but that he searched it, primarily looking for weapons, but also to ascertain whether it contained drugs. There were other officers in the room at the time, but no evidence was introduced that they were so placed that it was impossible for defendant to reach and enter the attache case. At some point, defendant was handcuffed but the evidence does not show that this had occurred prior to search of the attache case. On the record before us, we cannot conclude that defendant could not, by a quick movement, reach the attache case and obtain a weapon concealed therein or destroy evidence contained in the case. Accordingly, we hold that the search of the attache case did fall within the limits prescribed by *Chimel* and the amphetamine capsules obtained in said search were admissible in evidence in support of Count II.[6]

Judgment affirmed.

MORGAN, HOLMAN, BARDGETT, HENLEY, and DONNELLY, JJ., concur.

SEILER, C. J., concurs in part and dissents in part in separate opinion filed.

SEILER, Chief Justice (concurring in part and dissenting in part).

I concur in the affirmance of the conviction on Count I but dissent as to Count II. The state failed to carry its burden of proof

---

**6.** Cases in the federal and state courts considering the propriety under *Chimel* of searches of the area alleged to be within the immediate control of the person arrested are legion. We see no need to engage in an extended analysis and review of those cases. Support for the conclusion we reach can be found in the following: *State v. Henderson*, 510 S.W.2d 813, 819 (Mo.App.1974); *United States v. Mason*, 523 F.2d 1122 (D.C.Cir. 1975); *United States v. Jones*, 475 F.2d 723 (5th Cir. 1973); *United*

*States v. Harrison*, 461 F.2d 1127 (5th Cir. 1972); *United States v. Simpson*, 330 A.2d 756 (D.C.1975); *State v. Cox*, 294 Minn. 252, 200 N.W.2d 305 (1972); *State v. Fulford*, 290 Minn. 236, 187 N.W.2d 270 (1971); *State v. Mayer*, 129 Vt. 564, 283 A.2d 863 (1971); *People v. King*, 5 Cal.3d 458, 96 Cal.Rptr. 464, 487 P.2d 1032 (In Bank 1971); *Simberg v. State*, 288 Minn. 175, 179 N.W.2d 141 (1970); *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753 (1970).

as to valid grounds for making a warrantless search of the attache case, in which were found the drugs on which the conviction under Count II rests.

Who has the burden of proof to show, in the words of the leading case on the subject, *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969) that the search beyond the person of the arrestee is in an area "within his immediate control"? It is the prosecution, because as that case and many others hold, the burden is on those seeking an exemption from the requirement of a search warrant to show the need for it. "The exceptions are 'jealously and carefully drawn,' . . . '[T]he burden is on those seeking the exemption to show the need for it.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971).

It follows that when the search is sought to be justified because it is of an area within the immediate control of the person arrested, the burden is on the prosecution to show that such is the fact if it is to prevail on the motion to suppress. See, for example, *United States v. Marotta*, 326 F.Supp. 377, 384 (S.D.N.Y.1971), affirmed without opinion, 456 F.2d 1336 (2d Cir. 1972), where the court sustained a motion to suppress over the government's contention that the seizure was lawful under *Chimel*, supra, as being in the area within the immediate control of the person arrested, ". . . *the Government not having shown* . . . that the search and seizure was within the permissible scope of searches and seizures incident to lawful arrests . . ." (emphasis supplied). In *Scott v. State*, 7 Md. App. 505, 256 A.2d 384, 389 (1969), the court says: "We think that *Chimel* requires that *the State show* that the search was conducted and items were seized in an area 'within the reach' of the arrestee in this concept . . ." (emphasis supplied). See, also, *United States v. Jones*, 475 F.2d 723, 727 (5th Cir. 1973), stating: "Because the search here must now be characterized as warrantless, *the government must establish* that it is within one of the exceptions to the warrant requirement" (emphasis supplied).

The case dealt with the search of a suitcase about a foot and a half away from the head of the bed on which defendant was asleep when arrested.

See, also, *State v. Sutton*, 454 S.W.2d 481, 490 (Mo. banc 1970) (Finch, J., dissenting), ". . . the burden of proof to establish that some exception is applicable *rests on the government* . . ." (emphasis supplied).

In the case before us, the attache case was closed and at least four feet distant from the defendant. The manpower arrayed against defendant was overpowering. One officer, Zinselmeier, had placed defendant under arrest and had searched his person, while defendant was leaning against the wall, facing it, hands up. Another officer, Reifschneider, was in the room, having entered with Zinselmeier. Three other officers were present in the room, but "no evidence was introduced that they were so placed that it was impossible for defendant to reach and enter the attache case", although Zinselmeier was close enough to the attache case so that he opened it "promptly", which included undoing the clasp. The defendant was handcuffed, but the evidence does not show when with relation to the opening of the attache case. The principal opinion asserts that "On the record before us, we cannot conclude that defendant could not, by a quick movement, reach the attache case and obtain a weapon concealed therein or destroy evidence contained in the case." It seems to me this places the burden on the defendant to show that he could not have acted to accomplish the above, whereas the burden to show facts justifying the exemption is on the state, which failed to carry it, although the state had five police officers who should have been able to establish the facts if they in truth existed in their favor.

In my opinion, it is clear that under the circumstances the attache case was not within the immediate control of the defendant. But if I am mistaken, then the most that can be said on the other side of the coin on the evidence before us is that it is unclear and speculative whether the at-

tache case was in the immediate control of the defendant in the sense that he could have gotten to and opened it in time to seize a weapon or destroy incriminating evidence therein. This is not sufficient to carry the prosecution's heavy burden of proof. In fact, if the situation were such that there was a good chance defendant could have gotten to the attache case and made use of its contents, the action of Zinselmeier in opening it "promptly" would have enhanced the opportunity. It would have helped defendant do what the police did not want him to do. I do not believe the police officer would have made any such foolish move, had there been any possibility defendant could have taken advantage of it, which further leads me to believe the prosecution had no evidence available which would support the exemption by which they would be entitled to search the attache case.

The holding of the principal opinion is opposed to the basic proposition established years ago that constitutional provisions for the security of person and property should be liberally construed. *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Officer Zinselmeier no doubt was using his best judgment that he should search the attache case,[1] but that does not mean that his judgment is not properly subject to constitutional scrutiny or that he has the right to abrogate the Fourth Amendment.

In my opinion, the search of the attache case was illegal on the record before us and the conviction on Count II should be reversed and I therefore respectfully dissent as to Count II.

---

1. Zinselmeier and the others had seen defendant enter the motel room carrying the attache case and Zinselmeier testified it was his policy as incident to any arrest for him to search "whatever possessions a person has with him." With this as his guideline, it is not a strained conclusion that once Zinselmeier had defendant under arrest, he would promptly have searched the attache case no matter where it was in the room.